**UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF NEW YORK**

---

**WILLIAM COLSTON,**

**Plaintiff,**

**-vs-**

**CITY OF BUFFALO, BUFFALO POLICE DEPARTMENT, POLICE OFFICER JAMES O'DONNELL, Individually and in his Official Capacity, POLICE OFFICER R. AMMERMAN, Individually and in his Official Capacity, and LIEUTENANT JOHN P. KING, Individually and in his Official Capacity,**

**Defendants.**

---

# MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS AND FOR SUMMARY JUDGMENT

**Civ. No.: 01-CV-0070A(F)**

**BROWN & HUTCHINSON**
**T. Andrew Brown, Esq., of Counsel**
Attorneys for Plaintiff
William Colston
925 Crossroads Building
Two State Street
Rochester, New York 14614
(585) 454-5050

## PRELIMINARY STATEMENT

This is an action pursuant to 42 U.S.C. §§ 1981 and 1983 for damages arising out of the unlawful stop, detention, false arrest, illegal search and seizure and false imprisonment of William Colston by police officers James O'Donnell, R. Ammerman and Lieutenant John P. King of the Buffalo, New York police department. The actions complained of arose on March 26, 2000, when plaintiff was unlawfully stopped by defendants O'Donnell and Ammerman while driving his motor vehicle in the City of Buffalo. Plaintiff was subsequently detained, illegally searched, taken into custody and had his personal property seized by defendants. Before plaintiff was released, without any tickets, citations or charges issued against him, he was threatened, by Lieutenant John P. King, with arrest if he filed a citizen's complaint against the aforementioned officers.

This memorandum of law is submitted in opposition to defendants City of Buffalo, Buffalo Police Department, Police Officer James O'Donnell, Police Officer R. Ammerman and Lieutenant Jon P. King's motion to dismiss and for summary judgment on the grounds that genuine issues of material fact exist precluding defendants from succeeding on their motion. There has been ample evidence adduced through deposition testimony and discovery suggesting defendants, City of Buffalo and Buffalo Police Department, were aware of and condoned, or showed a tacit disregard for, East District police officers' racial discrimination, including racial profiling, against African-American citizens within the East District as well as East District police officers engaging in a pattern and practice of illegal stops, searches, detentions and harassment of Buffalo citizens in general. Genuine issues of material facts also exist as to whether defendants unlawfully stopped, detained, searched and seized plaintiff's personal property in violation of his constitutional rights and whether the unlawful stop, search, detention and seizure were the direct result of a Buffalo Police Department practice and policy of racial discrimination and racial profiling.

## STATEMENT OF FACTS[1]

On March 26, 2000, at or about 11:00 p.m., plaintiff was lawfully operating his motor vehicle on East Ferry Street in the City of Buffalo, New York, when, without any legal justification, plaintiff was stopped, harassed, searched, detained and had his personal property seized by Officers O'Donnell and Ammerman of the Buffalo Police Department.

After being stopped, plaintiff repeatedly requested defendants to provide a reason for the stop and detention as well as the seizure of his personal property. Despite plaintiff's repeated requests that he be given a reason for the unlawful stop, seizure and detention, Officers O'Donnell and Ammerman never provided plaintiff with any reason for the stop. Although plaintiff was never informed of any wrongdoing, Officer O'Donnell illegally searched plaintiff's vehicle and unlawfully seized his personal property which included a properly and legally registered handgun despite the fact that plaintiff promptly provided Officers O'Donnell and Ammerman with a copy of his valid pistol permit showing proof of registration and ownership. At the request of the two officers, plaintiff promptly supplied them with proof of his identification and informed the officers that he was a City of Buffalo Firefighter. Despite having plaintiff's full cooperation, Officer O'Donnell proceeded to treat plaintiff as if he were a convicted and dangerous felon, verbally berating, harassing and degrading him

Plaintiff fully cooperated with defendants despite the fact that defendants had no probable cause to stop, detain, seize and search his car or his belongings. Nevertheless, Officer O'Donnell continued to verbally accost plaintiff by telling plaintiff to "shut up," and informing plaintiff that he was going to arrest plaintiff for being a "smart ass" each time plaintiff requested that he be given

---

[1] Facts relied upon herein are restated from the Affirmation of T. Andrew Brown, Esq., and attached exhibits thereto, submitted herewith.

a reason for the stop. The officers detained plaintiff and took him into custody, transporting him to the Buffalo Police Department. Once plaintiff arrived at the police station he was subjected to unwarranted police custodial interrogation against his will and without the presence of an attorney. After the two officers interrogated him, plaintiff was finally informed that he would be allowed to go free and that no charges would be filed or traffic citations issued, once Lieutenant John P. King "checked" plaintiff's background, proving that he was indeed a City of Buffalo Firefighter. Plaintiff was also informed plaintiff that if he filed a citizen complaint regarding the actions of Officers O'Donnell and Ammerman, he would be arrested and charged with an offense. This despite the fact that plaintiff was never informed of any law he allegedly violated.

Although defendants were able to verify plaintiff's identification and plaintiff had committed no violation of law, plaintiff was still not allowed to leave the police station until a Caucasian Firefighter, Joe Rankin, agreed to come to the police station to confirm plaintiff's identity and attest to plaintiff's good character. Before plaintiff was released, Lieutenant King told plaintiff that he would not charge plaintiff with anything if plaintiff agreed not to file a claim against his officers.

Not only was defendants' stopping, detaining, interrogating, harassing, searching and seizing of plaintiff and his personal belongings unlawful and in violation of plaintiff's constitutional rights, it was also racially motivated and done pursuant to defendants' practice and policy of discrimination and racial profiling against African-Americans. Plaintiff was just one of many African-Americans subjected to the same type of unlawful treatment and harassment as a part of defendants' practice and policy. It is irrefutable that such a policy and practice exist as Buffalo Police Captain, Fred D.

Young, assigned to the East District, where Officers O'Donnell, Ammerman and Lieutenant King were stationed, testified under oath to that fact.

Upon plaintiff's release, plaintiff was further harassed and tormented by Lieutenant King each and every time he contacted the police department to request the return of his property that was wrongfully seized and taken from him on March 26, 2000.

**ARGUMENT**

A district court may grant a motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(6) only if it appears beyond doubt that the non-moving party could prove no set of facts that would entitle it to relief. See Hishon v. King & Spalding, 467 U.S. 69, 73 (1984); Valmonte v. Bane, 18 F.3d 992, 998 (2d Cir.1994). In reviewing the pleadings, a court must accept the non-moving party's factual allegations as true. Hishon, 467 U.S. at 73. The court's only legitimate function when hearing a Rule 12(b)(6) motion is to ascertain whether, under plaintiff's pleadings there has been set forth a claim which can legally be redressed. *See*, Pollack v. Ridge, 2004 WL 614554 (W.D.N.Y. 2004). The Court must liberally construe plaintiff's pleadings when reviewing same. Id.

Summary judgment may not be granted unless "the pleadings, depositions, answers to interrogatories and admissions on file, together with affidavits, if any, show that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (S. Ct. 1986). "The trial court's task at the summary judgment motion stage of the litigation is carefully limited to discerning whether there are genuine issues of material fact to be tried, not deciding them. Its duty, in short, is confined at this point to issue-finding; it does not extend to issue-resolution." Gallo v. Prudential Residential Services Ltd. Partnership, 22 F.3d 1219, 1223 (2d Cir. 1994). In determining whether to grant summary judgment "all ambiguities must be

resolved and all reasonable inferences drawn in favor of the party against whom summary judgment is sought." Id. at 1223.

Viewing the facts herein in the light most favorable to plaintiff, summary judgment should be denied on the grounds that genuine issues of material fact exist precluding defendants from succeeding on their motion. There has been ample evidence adduced through deposition testimony and discovery suggesting defendants, City of Buffalo and Buffalo Police Department, were aware of and condoned, or showed a tacit disregard for, East District police officers' racial discrimination, including racial profiling, against African-American citizens within the East District as well as East District police officers engaging in a pattern and practice of illegal stops, searches, detentions and harassment of Buffalo citizens. Genuine issues of material facts also exist as to whether defendants unlawfully stopped, detained, searched and seized plaintiff's personal property in violation of his constitutional rights and whether the unlawful stop, search, detention and seizure were the direct result of a Buffalo Police Department practice and policy of racial discrimination and racial profiling. Moreover, a genuine issue of material fact precluding summary judgment also exists concerning Officer O'Donnell and Officer Ammerman's claims of qualified immunity because the facts are disputed as to whether Officers O'Donnell and Ammerman possessed probable cause to stop and detain plaintiff's motor vehicle as well as whether or not it was objectively reasonable for Officers O'Donnell and Ammerman to believe that they were not violating plaintiff's clearly established constitutional rights by unlawfully stopping, detaining, interrogating, and seizing plaintiff and his personal property.

## POINT I

## DEFENDANTS CITY OF BUFFALO AND BUFFALO POLICE DEPARTMENT ARE LIABLE TO PLAINTIFF BECAUSE DEFENDANTS' POLICIES AND/OR CUSTOMS CAN REASONABLY BE SAID TO HAVE CAUSED OF PLAINTIFF'S INJURIES

In Monell v. Dept. of Social Services of New York, 436 U.S. 658, (1978), the Supreme Court established the standard for municipal liability under § 1983. The Court explained that liability will attach where "execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts [an] injury...." Id. at 694. Although respondeat superior liability is not recognized under § 1983, a municipality may be held liable where "persons in positions of responsibility in the local government were so deliberately indifferent to prior incidents of police misconduct as to tacitly encourage, condone, or acquiesce in such behavior." Estate of Jackson, 705 F.Supp. 779, 789 (W.D.N.Y.1989) (citing Turpin v. Mailet, 619 F.2d 196 (2d Cir.); Turpin v. City of West Haven, 449 U.S. 1016, 1017 (1980)).

In failure to train cases, the Supreme Court has explained: ... the inadequacy of police training may serve as the basis for § 1983 liability only where the failure to train amounts to deliberate indifference to the rights of the persons with whom the police come into contact.... Only where a municipality's failure to train its employees in a relevant respect evidences a "deliberate indifference" to the rights of its inhabitants can such a shortcoming be properly thought of as a city "policy or custom" that is actionable under § 1983. City of Canton, Ohio v. Harris, 489 U.S. 378, 388 (1988).

Here, plaintiff was unlawfully stopped, searched, detained and harassed as a direct result of the defendants' policy and practice of racial discrimination and racial profiling in the East District.

City of Buffalo Police Captain Fred D. Young testified, under sworn oath at his deposition, that he believes racial profiling exists within the City of Buffalo. Captain Young further testified that he advised higher ranking officials, including Commissioner of Police Rocco Diina, of his concerns yet no training was ever provided to City of Buffalo police officers, including the individually named defendants, so as to educate them as to what racial profiling is and that it constitutes unlawful law enforcement. By failing to provide City of Buffalo Police Officers with the necessary and needed training on racial discrimination and racial profiling issues, all the while knowing the problem existed within the department, defendants' actions amounted to tacit encouragement and condonation of the unlawful police tactics.

The courts have also reasoned that the specific deficiency or deficiencies alleged in a failure to train, supervise and/or discipline case must be such as to make the specific violation 'almost bound to happen, sooner or later,' rather than merely 'likely to happen in the long run.' " City of Fayetteville, N.C. v. Spell, 484 U.S. 1027 (1988). In this case, defendants were aware of other complaints by African-Americans concerning improper and harassing conduct of its police officers stationed in the East District including, but not limited to, illegal searches, improper seizure of personal property and refusing to return personal property despite not having a valid reason for its retention. Defendants were also well aware of prior citizen complaints voicing concern over the illegal police practices with respect to unlawful stops, searches and seizures in the East District. Moreover, defendants were made aware of citizen complaints made against two of the named defendants in this action, Lieutenant King and Police Officer O'Donnell.

Of the 70 to 80 police officers assigned to the East District, there were more citizen complaints alleging violations of police procedures and civil rights levied against defendant

O'Donnell than any other officer, excluding one, in the East District of the City of Buffalo Police Department. Despite this fact, defendants did nothing to either discipline, train or counsel O'Donnell concerning his unlawful and harassing behavior.

By failing to address, adequately train and/or discipline its police officers in the East District with respect to the violation of the civil rights of African-American citizens, defendants condoned and consented to the behavior of said officers thereby instituting an unwritten practice and policy of racial discrimination and racial profiling against African-American citizens. City of Canton, Ohio v. Harris, 489 U.S. 378, 388 (1988).

Based on the foregoing, plaintiff has carried its burden as set forth in Monell and established a question of fact concerning the liability of municipal defendants City of Buffalo and Buffalo Police Department. As a genuine issue of material fact exists, defendants' motion to dismiss and for summary judgment must be denied.

**POINT II**

**DEFENDANTS ARE NOT ENTITLED TO QUALIFIED IMMUNITY AS THEIR ACTIONS CANNOT REASONABLY BE INTERPRETED TO BE CONSISTENT WITH PLAINTIFF'S RIGHTS UNDER FEDERAL AND STATE LAW, AND THE UNITED STATES CONSTITUTION**

Qualified immunity is only a defense for government officials sued in their individual capacities, not in their official capacities. Generally, government officials performing discretionary functions are shielded from personal liability for civil damages as long as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). Thus, an official sued in his individual capacity for civil damages alleging violations of federal law may be able to assert personal immunity defenses including objectively reasonable reliance on existing law. Kentucky v. Graham, 473 U.S.

159, 166-167 (S. Ct. 1985); Fodelmesi v. Schepperly, NO. 87 CIV. 6762, 1992 WL 84469, at *1 (S.D.N.Y. 1992). However, qualified immunity for police officers is only available on a motion for summary judgment "[I]f it appears, from undisputed facts, that an officer's conduct did not violate constitutional rights that were clearly established at the time of his or her actions, or that it was objectively reasonable for him or her to believe that his or her actions did not violate such rights." (emphasis added) Fodelmesi, 1992 WL 84469 at *2; Kaminsky v. Rosenblum, 929 F.2d 922, 925 (2d Cir. 1991). Where facts are disputed, qualified immunity should not be granted on a summary judgment motion. Id.

The Second Circuit recently summarized the doctrine of qualified immunity as it is applicable in civil rights cases alleging violations under § 1983. "Analysis of a qualified immunity claim consists of a three step inquiry. First, [we] must determine whether plaintiff has alleged a violation of a constitutional right. Then [we] consider if the violated right was clearly established at the time of the conduct. Finally, if plaintiff had a clearly established, constitutionally protected right that was violated by the actions of the [defendant], he or she must demonstrate that defendants' actions were not objectively reasonable." Harhay v. Town of Ellington Bd. of Educ., 323 F.3d 206, 211-12 (2d Cir.2003).

Here, plaintiff's constitutional rights under the Fourth Amendment of the United States Constitution were violated by defendants when plaintiff was unlawfully stopped, searched, detained and his person and property seized against his will and without legal justification. Thus, plaintiff has, in good faith, satisfied the first prong of the test set forth above. In satisfaction of the second prong, as police officers, defendants cannot argue that they were unaware of plaintiff's right to be free from unreasonable searches and seizures, and unlawful stopping, detaining and imprisonment.

With respect to the third and final prong of the above-defined test, because the stop of plaintiff's automobile constituted a seizure of plaintiff for federal and state law purposes, the stop must have been justified at its inception or else it was unlawful and violative of plaintiff's legal and constitutional rights under Federal and state law. People v. Banks, 626 N.Y.S 2d 986, 992 (1995).

The Fourth Amendment protections are designed not only to protect people from searches and seizures that would be deemed unreasonable if conducted at all, but they are in place to ensure the reasonableness of all searches and seizures that are carried out. *See*, Lauro v. Charles, 202 F.3d 219 (2d Cir. 2000). It is well established that evidence obtained as a result of acts in violation of the Fourth Amendment may not be used against a defendant. *See*, Costello v. United States, 365 U.S. 265, 280 (1961). Additionally, the Supreme Court has long since ruled that a warrantless search of a suspect's person may only be conducted incident to a valid arrest that is consistent with the Fourth Amendment. *See*, New York v. Belton, 453 U.S. 454, 457 (1981). Here, as defendants possessed no probable cause to stop and detain plaintiff's motor vehicle, any and all actions taken subsequent to said stop and detention, including the searching of plaintiff and seizure of plaintiff's personal possessions, were done in violation of plaintiff's Fourth Amendment rights and, thus, were illegal at their inception.

Defendants' actions were not objectively reasonable under the circumstances and, therefore, they were violative of plaintiff's Fourth Amendment rights. Defendants O'Donnell and Ammerman possessed no probable cause to stop, search, seize and detain plaintiff and plaintiff's motor vehicle. Defendants proffered reason for stopping plaintiff's motor vehicle on March 26, 2000, is because plaintiff allegedly "passed a stop sign" on East Ferry Street. However, despite this alleged violation of the New York State Vehicle and Traffic Law, plaintiff was never ticketed or cited for such a

violation. In fact, despite defendants stopping, searching, detaining and interrogating plaintiff, no tickets, citations or arrest warrants were ever issued against plaintiff for violation of any law.

Furthermore, plaintiff has requested defendants to produce admissible documentation including, but not limited to, police reports, notes, memoranda and radio dispatch records evidencing plaintiff's alleged violation of New York State Vehicle and Traffic law. To date, defendants have failed to produce any such evidence, aside from defendants' own self-serving statements, proving such a violation of law occurred. The fact remains that despite numerous and repeated requests for an explanation of why he was stopped, plaintiff was never given a reason. It was not until plaintiff filed his Complaint that he heard for the first time that his motor vehicle was stopped and detained as a result of his allegedly "pass[ing] a stop sign."

In an attempt to justify and explain their unlawful actions, defendants maintain that plaintiff was abusive, uncooperative, hostile and smelled of an alcoholic beverage and that he was given a break when he could have been arrested. However, City of Buffalo Police Commissioner Rocco J. Diina was well aware that O'Donnell, Ammerman and King's proffered reasons for stopping, searching and detaining plaintiff were strikingly similar to those reasons routinely stated in response to Professional Standard Division complaints when officers are suspected of engaging in unlawful stops and illegal searches. Moreover, Commissioner Diina had been informed by Captain Fred D. Young, as early as 1999, that this very same language was routinely used by police officers in an attempt to justify the officers' unlawful actions after a complaint of improper police procedure and/or conduct has been received by the Professional Standards Division. Yet Commissioner Diina, the highest ranking police officer within the Buffalo Police Department, took no steps to address or

correct these problems. Commissioner Diina also failed to supervise, train and/or discipline officers that violated the civil rights of East District citizens.

Plaintiff's Complaint alleges serious violations of his civil rights as well as the civil rights of other African-Americans within the City of Buffalo. Plaintiff believes defendants have engaged in, endorsed and tacitly condoned, unlawful police policies and practices of racial discrimination and racial profiling. Plaintiff has raised, and shown to exist, material questions of fact concerning defendants City of Buffalo and Buffalo Police Departments' policy, practice and custom of racial discrimination and racial profiling as well as defendants' policy and practice of engaging in illegal stops, searches and seizures of East District citizens in general. Plaintiff has also raised material questions of fact as to the lawfulness and pre-textual reason for defendants O'Donnell and Ammerman's stop of plaintiff's motor vehicle on March 26, 2000. As such, plaintiff requests that this Court deny defendants' motion in its entirety and allow a trier of fact to determine the validity of plaintiff's claims, as well as the credibility of the parties.

"It is the function of the Courts to ensure that such serious accusations receive appropriate scrutiny lest our Court appears to endorse such official misconduct, which would weaken the public's respect for the administration of justice . . . . It will be for a jury to determine at trial whether plaintiffs have proved their very serious charges." Ricciuti v. N.Y.C. Transit Auth., 124 F.3d 123, 125 (2d Cir. 1997).

In view of the existence of disputed, material facts and the seriousness of plaintiff's charges, defendants' motion to dismiss plaintiff's Complaint and for summary judgment should be denied.

## CONCLUSION

There are genuine issues of material fact which exist precluding defendants from succeeding on their motion to dismiss plaintiff's complaint. There has been ample evidence educed through deposition testimony and discovery showing defendants, City of Buffalo and Buffalo Police Department, were aware of and condoned, or showed a tacit disregard, for East District police officers' policy and practice of conducting illegal stops, searches and seizures of Buffalo citizens in general as well as East District police officers having a policy and practice of engaging in racial discrimination and racial profiling against African-American citizens within the City of Buffalo.

Furthermore, the actions of defendants O'Donnell, Ammerman and King have been shown to be consistent with the policy and practice of defendants. Although defendants claim there was probable cause to stop, search and detain plaintiff on March 26, 2000, there has been absolutely no evidence, other than defendants' self-serving statements in their depositions and internal police correspondence, offered by defendants in an attempt to establish that defendants had to take said actions at the time of the underlying incident.

Based upon the foregoing, plaintiff respectfully requests that this Court deny defendants' motion in its entirety and permit this matter to proceed to trial to determine the credibility of the parties and the merits of plaintiff's claims.

Dated: April 27, 2004

**BROWN & HUTCHINSON**

s/ T. Andrew Brown

**T. Andrew Brown, Esq.**
Attorneys for Plaintiff
William Colston
925 Crossroads Building
Two State Street
Rochester, New York 14614
(585) 454-5050